United States Court of Appeals
**FOR THE EIGHTH CIRCUIT**
No. 96-3288EM

| | |
|---|---|
| Frank J. Carman, | * |
| | * |
| Appellant, | * |
| | * On Appeal from the United |
| v. | * States District Court for |
| | * the Eastern District |
| | * of Missouri. |
| McDonnell Douglas Corporation, | * |
| | * |
| Appellee. | * |

_____

Submitted: April 14, 1997
Filed: June 11, 1997
_____

Before RICHARD S. ARNOLD, Chief Judge, FAGG and MURPHY, Circuit Judges.
_____

RICHARD S. ARNOLD, Chief Judge.

In October 1992, McDonnell Douglas Aircraft Corporation laid off Frank Carman as part of a reduction in force of its management staff. Carman then sued McDonnell Douglas, claiming that his termination violated the Age Discrimination in Employment Act, the Missouri Human Rights Act, and the Employee Retirement Income Security Act of 1974. In the course of discovery, the District Court denied Carman's request for the production of certain documents, holding that they were protected by the "Ombudsman Privilege." The District Court later granted summary judgment to McDonnell Douglas, a decision which Carman now appeals. Because we

hold that the District Court lacked sufficient justification for creating an ombudsman privilege and denying Carman's discovery request, we reverse and remand.

## I.

In June 1994, Carman requested 54 sets of documents from McDonnell Douglas. Item No. 53 was a request for "[a]ll notes and documents reflecting data known to . . . Clemente [a company ombudsman] . . . concerning" the plaintiff, a number of other individuals, and various topics including "[m]eeting notes regarding lay-offs in Plaintiff's Division" and "[m]eeting notes regarding Plaintiff Frank Carman." Appellant's App. 346-47. McDonnell Douglas objected to this and many other requests as vague, overbroad, and irrelevant, and further objected "with regard to documents known to Therese Clemente because her activities as an 'ombudsman' were considered confidential and any information and documents relating to her activities are immune from discovery." Id. at 358. In response, plaintiff filed a motion to compel production of certain documents. The Court granted the motion in part and ordered the defendants to produce a number of documents, including those requested in Item No. 53. Id. at 360. Two months later, however, in clarifying its order with respect to Item No. 53, the Court ruled that "defendant is not required to produce documents protected by the Ombudsman Privilege." Id. at 362. The Court also held that McDonnell Douglas did not have to produce adverse impact analyses prepared in anticipation of litigation and limited Carman's request for information about McDonnell Douglas's past reductions in force to the McDonnell Douglas Aircraft Company, the component company of McDonnell Douglas Corporation where Carman worked. In February 1996, the Court granted McDonnell Douglas's motion for summary judgment. The Court assumed that Carman had established a prima facie case of age discrimination but held that he had failed to present sufficient evidence that McDonnell Douglas's stated reasons for laying him off were pretextual. This appeal followed.

II.

Carman first contends on appeal that the District Court erred in granting summary judgment before McDonnell Douglas complied with two document requests with respect to which the District Court had granted a motion to compel. The first was a request for various employee personnel files. In its order denying plaintiff's motion to amend or alter the judgment, the District Court found that these records had been made available to the plaintiff prior to the deadline for responding to defendant's summary-judgment motion. This finding was not clearly erroneous, and we uphold it. To establish that this material was not available, Carman points to correspondence between attorneys which was not before the District Court when it ruled on defendant's summary-judgment motion. We grant defendant's motion to strike this evidence, but also note that it does not in any event establish that the District Court's finding was clearly erroneous.

The second group of documents at issue was described in a request for "all employee rating and/or ranking lists or documents used in making lay-offs in McAIR [McDonnell Douglas Aircraft Company] and/or MDA-E [McDonnell Douglas Aerospace East] during 1989 through 1993." Appellant's App. 349. It is undisputed that McDonnell Douglas had not complied with this request before the District Court granted its summary-judgment motion. The District Court held that, assuming that plaintiff did not have all the information he needed to respond to defendant's summary-judgment motion, his failure to file a Rule 56(f) affidavit explaining why more discovery was needed defeats any argument that summary judgment was premature. We cannot say that the District Court abused its discretion in holding Carman to the requirements of Rule 56(f). Nothing in this opinion should be read to prevent the District Court from giving Carman the opportunity on remand to explain why he needs this information.

With respect to the adverse-impact analyses that the District Court protected from discovery, Carman argues that even if they were privileged, McDonnell Douglas should still have produced the data underlying the analyses. As McDonnell Douglas points out, however, other documents that the District Court required McDonnell Douglas to produce would have provided plaintiff with the equivalent of the data underlying the adverse-impact analyses.

The District Court also did not abuse its discretion in limiting Carman's request for information about past McDonnell Douglas reductions in force to the division in which he worked. Company-wide statistics are usually not helpful in establishing pretext in an employment-discrimination case, because those who make employment decisions vary across divisions. Absent some more particularized argument from plaintiff as to how such information might have helped in this case, we cannot say that the District Court abused its discretion in limiting the scope of Carman's discovery request.

## III.

We now turn to the issue of the "ombudsman privilege." In the context of this case, the term "ombudsman" refers to an employee outside of the corporate chain of command whose job is to investigate and mediate workplace disputes.[1] The corporate ombudsman is paid by the corporation and lacks the structural independence that characterizes government ombudsmen in some countries and states, where the office of ombudsman is a separate branch of government that handles disputes between citizens and government agencies. Nonetheless, the corporate ombudsman purports to

---

[1]Though it is not entirely clear from the record whether this is still the case, the head of the ombudsman office at McDonnell Douglas Aircraft Company in 1991 held the position of company vice-president. See Kientzy v. McDonnell Douglas Corp., 133 F.R.D. 570, 572 (E.D. Mo. 1991).

be an independent and neutral party who promises strict confidentiality to all employees and is bound by the Code of Ethics of the Corporate Ombudsman Association, which requires the ombudsman to keep communications confidential. McDonnell Douglas argues for recognition of an evidentiary privilege that would protect corporate ombudsmen from having to disclose relevant employee communications to civil litigants.[2]

Federal Rule of Evidence 501 states that federal courts should recognize evidentiary privileges according to "the principles of the common law" interpreted "in the light of reason and experience." The beginning of any analysis under Rule 501 is the principle that "the public has a right to every man's evidence." Hardwicke, L.C.J., quoted in 12 Cobbett's Parliamentary History 675, 693 (1742) (quoted with approval in United States v. Bryan, 339 U.S. 323, 331 (1950)). Accordingly, evidentiary privileges "are not lightly created." United States v. Nixon, 418 U.S. 683, 710 (1974). A party that seeks the creation of a new evidentiary privilege must overcome the significant burden of establishing that "permitting a refusal to testify or excluding relevant evidence has a public good transcending the normally predominant principle of utilizing all rational means for ascertaining truth." Trammel v. United States, 445 U.S. 40, 50 (1980) (quoting Elkins v. United States, 364 U.S. 206, 234 (1960) (Frankfurter, J., dissenting)).

The first important factor for assessing a proposed new evidentiary privilege is the importance of the relationship that the privilege will foster. The defendant argues that ombudsmen help resolve workplace disputes prior to the commencement of expensive and time-consuming litigation. We agree that fair and efficient alternative

---

[2]Though neither party addresses the issue in any depth, McDonnell Douglas seems to argue that the District Court's decision to recognize the privilege is reviewable only for abuse of discretion. We believe, to the contrary, that the scope of a privilege and the decision whether to establish a new privilege are mixed questions of fact and law which we review de novo.

dispute resolution techniques benefit society and are worthy of encouragement. To the extent that corporate ombudsmen successfully resolve disputes in a fair and efficient manner, they are a welcome and helpful addition to a society that is weary of lawsuits.

Nonetheless, far more is required to justify the creation of a new evidentiary privilege. First, McDonnell Douglas has failed to present any evidence, and indeed has not even argued, that the ombudsman method is more successful at resolving workplace disputes than other forms of alternative dispute resolution, nor has it even pointed to any evidence establishing that its own ombudsman is especially successful at resolving workplace disputes prior to the commencement of litigation. In recognizing a privilege for the McDonnell Douglas ombudsman's office in 1991, the court in Kientzy v. McDonnell Douglas Corp., 133 F.R.D. 570, 572 (E.D. Mo. 1991), found that the office had received approximately 4,800 communications since 1985, but neither the court nor McDonnell Douglas in the present case provides us with any context to evaluate the significance of this statistic.

Second, McDonnell Douglas has failed to make a compelling argument that most of the advantages afforded by the ombudsman method would be lost without the privilege. Even without a privilege, corporate ombudsmen still have much to offer employees in the way of confidentiality, for they are still able to promise to keep employee communications confidential from management. Indeed, when an aggrieved employee or an employee-witness is deciding whether or not to confide in a company ombudsman, his greatest concern is not likely to be that the statement will someday be revealed in civil discovery. More likely, the employee will fear that the ombudsman is biased in favor of the company, and that the ombudsman will tell management everything that the employee says. The denial of an ombudsman privilege will not affect the ombudsman's ability to convince an employee that the ombudsman is neutral, and creation of an ombudsman privilege will not help alleviate the fear that she is not.

We are especially unconvinced that "no present or future [McDonnell Douglas] employee could feel comfortable in airing his or her disputes with the Ombudsman because of the specter of discovery." See Appellee's Br. 45. An employee either will or will not have a meritorious complaint. If he does not and is aware that he does not, he is no more likely to share the frivolousness of his complaint with a company ombudsman than he is with a court. If he has a meritorious complaint that he would prefer not to litigate, then he will generally feel that he has nothing to hide and will be undeterred by the prospect of civil discovery from sharing the nature of his complaint with the ombudsman. The dim prospect that the employee's complaint might someday surface in an unrelated case strikes us as an unlikely deterrent. Again, it is the perception that the ombudsman is the company's investigator, a fear that does not depend upon the prospect of civil discovery, that is most likely to keep such an employee from speaking openly.

McDonnell Douglas also argues that failure to recognize an ombudsman privilege will disrupt the relationship between management and the ombudsman's office. In cases where management has nothing to hide, this is unlikely. It is probably true that management will be less likely to share damaging information with an ombudsman if there is no privilege. Nonetheless, McDonnell Douglas has provided no reason to believe that management is especially eager to confess wrongdoing to ombudsmen when a privilege exists, or that ombudsmen are helpful at resolving disputes that involve violations of the law by management or supervisors. If the chilling of management-ombudsman communications occurs only in cases that would not have been resolved at the ombudsman stage anyway, then there is no reason to recognize an ombudsman privilege.

McDonnell Douglas relies on the analysis of the court in Kientzy, supra, apparently one of only two federal courts to have recognized a corporate-ombudsman

privilege.[3] We do not find the reasoning of that opinion convincing. For example, the Kientzy opinion argues that confidentiality is essential to ombudsman-employee relationships because the function of that relationship is to "receive communications and to remedy workplace problems, in a strictly confidential atmosphere. Without this confidentiality, the office would just be one more non-confidential opportunity for employees to air disputes. The ombudsman's office provides an opportunity for complete disclosure, without the specter of retaliation, that does not exist in the other available, non-confidential grievance and complaint procedures." 133 F.R.D. at 572. As we have said, the corporate ombudsman will still be able to promise confidentiality in most circumstances even with no privilege. To justify the creation of a privilege, McDonnell Douglas must first establish that society benefits in some significant way from the particular brand of confidentiality that the privilege affords. Only then can a court decide whether the advantages of the proposed privilege overcome the strong presumption in favor of disclosure of all relevant information. The creation of a wholly new evidentiary privilege is a big step. This record does not convince us that we should take it.

IV.

We disagree with the District Court's holding that employee communications to Therese Clemente were protected from discovery by an ombudsman privilege. The judgment is reversed, and the cause remanded for further proceedings consistent with this opinion. On remand, the District Court should order the production of the evidence it had believed the privilege protected, unless there are other reasons why discovery of this evidence would not be appropriate. It should then reconsider its ruling on defendant's motion for summary judgment in light of this new evidence and the parties' arguments with respect to its significance.

---

[3]The other case is Roy v. United Technologies Corp., Civil No. H-89-680 (JAC) (D. Conn., May 29, 1990).

It is so ordered.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.